DiTullio '151 patent. And the Court of Appeal's claim interpretation was distinctly not what Infiltrator has argued to this Court. The recording of that oral argument is available at http://www.cafc.uscourts.gov/audiofiles/05-1375.mp3 and provides guidance on the proper construction of the claims in issue in this case. Specifically, the Court of Appeals indicated that claim 16 did not have a "means plus function" claim element but that claim 11 includes such "means plus function" elements. The Court of Appeals also indicated that an interpretation of the "means plus function" elements of claim 11 that required each and every lug, notch, support etc. was likely to be incorrect.

## A.    The Claim Construction Process

Claim construction, also known as "claim interpretation", involves a determination of "what it is that has been patented", *i.e.*, what are the literal metes and bounds of the invention set forth in the patent claims. Claim construction is a matter of law for resolution by the trial court. *Markman*, 52 F.3d at 979. The claim construction analysis begins with the language of the claims. *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed Cir. 1999). As a general rule, all terms in a patent claim are to be given their plain, ordinary and accustomed meaning to one of ordinary skill in the relevant art. *Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1299 (Fed. Cir. 1999) ("[W]ords in patent claims are given their ordinary meaning in the usage of the field of the invention, unless the text of the patent makes clear that a word was used with a special meaning."); *Johnson Worldwide Assocs.*, 175 F.3d at 989. In addition, unless compelled to do otherwise, a court will give a claim term the full range of its ordinary meaning as understood by an artisan of ordinary skill. *Johnson Worldwide Assocs.*, 175 F.3d at 989; *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 985-88 (Fed. Cir. 1988) (term

"plasticizer" given full range of ordinary and accustomed meaning to those of ordinary skill in the arts of polymer chemistry and the plastics industry).

Once a disputed claim term is identified by the parties and its plain meaning to the ordinarily skilled artisan is ascertained by the court, the next step is to examine the written description and the drawings to confirm that the patentee's use of the disputed term is consistent with the meaning given to it by the court. *Watts v. XL Sys, Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000); *Markman*, 52 F.3d at 979 ("Claims must be read in view of the specification, of which they are a part."). This confirmatory step is necessary for several reasons. First, patent law permits the patentee to choose to be his or her own lexicographer by clearly setting forth an explicit definition for a claim term that could differ in scope from that which would be afforded by its ordinary meaning. *Mycogen Plant Science v. Monsanto Co.*, 243 F.3d 1316, 1327 (Fed. Cir. 2001) ("[A] patentee is free to be his own lexicographer, so long as the special definition of a term is made explicit in the patent specification or file history."). After examining the written description and the drawings, the same confirmatory measure must be taken with the prosecution history, since statements made during the prosecution of a patent may affect the scope of the invention. *See Biodex Corp. v. Loredan Biomedical, Inc.*, 946 F.2d 850, 862-63 (Fed. Cir. 1991) (affirming the use of prosecution history to construe a claim).

In following this process, the Court should not fall into the trap of thinking that the patent claims are limited to the specific embodiment described in the patent. The Federal Circuit has reiterated several times that:

> [A]n applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention. *See SRI Int'l v. Matsushita Elec. Corp. of America*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). "[I]f structural claims were to be limited to devices operated precisely as a specification-described embodiment is operated, there would be no need for

claims. Nor could an applicant, regardless of the prior art, claim more broadly than that embodiment." *Id.* In short, it is the claims that measure the invention, as informed by the specification. As we noted long ago: "Specifications teach. Claims claim." *Id.* at 1121 n.14, 585 n.14.

*Rexnord Corp. v. Laitram Corp.,* 274 F.3d 1336, 1344 (Fed. Cir. 2001).

Where a claim includes "means plus function" claim language, the "means plus function" elements are to be interpreted according to 35 U.S.C. § 112, Paragraph 6:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

As such, "[s]ection 112, ¶6 limits the broad language of means-plus-function limitations in combination claims to equivalents of the structures, materials, or acts in the specification." *Valmont Indus., Inc. v. Reinke Mfg. Co., Inc.,* 983 F.2d 1039, 1043-44 (Fed. Cir. 1993). Construing means-plus-function claim limitations is a two-step process. The Court must first define the particular <u>function</u> of the claim phrase. *See Micro Chem., Inc. v. Great Plains Chem. Co.,* 194 F.3d 1250, 1257-58 (Fed. Cir. 1999). Second, the Court must identify the corresponding structure, material, or acts described in the specification which can perform that function. *Id.* at 1258.

Defendants have alleged infringement of claims 16 and 11 by Plaintiffs. The claim language in issue is discussed below.

**B.    Claim 16 is Not A "Means Plus Function" Claim.**

Claim 16 of the DiTullio '151 patent claims one stormwater chamber by itself:

"16.    A drain field gallery for guiding liquid through a drain field and allowing liquid to seep into adjoining ground comprising:

A.   an elongated main body portion having a corrugated arch-shaped configuration thereby creating an enlarged enclosure with a plurality of upstanding ribs spaced apart longitudinally therealong;

B.   at least one end wall covering one end of said elongated main body portion, said at least one end wall having an opening therethrough dimensionally sized to accept a drainpipe for transporting the liquid to said gallery;

C.   a latching engagement system associated with said at least one end wall for attaching said gallery to an adjoining gallery in an end-to-end engaged relationship, said latching system being dimensionally sized to vertically seat in latching engagement on the latching system of the adjoining gallery and to inhibit relative longitudinal movement between the galleries, *said at least one end wall inhibiting lateral spreading of said gallery and of said adjoining gallery and restraining said arch-shaped configuration against deformation*, wherein said latching engagement system is provided by end ribs of said plurality of ribs, and said end ribs are adjacent the terminal ends of said main body portion and are dimensionally sized to mate engagingly with end ribs on adjoining galleries,

*whereby said latching system includes said one end wall as means to prevent spreading of adjoining galleries once latched to one another*." [App. at A13]

The recent decision in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005), which issued since the previous decisions in this case and since the filing of Infiltrator's motion for summary judgment, is directly on point regarding interpretation of claim 16 of the DiTullio '151 patent. In that case, the Court concluded that claim language reciting "means disposed inside the shell for increasing its load bearing capacity comprising internal steel baffles extending inwardly from the steel shell walls" was *not* a "means plus function" clause. The court stated:

> Means-plus-function claiming applies only to purely functional limitations that do not provide the structure that performs the recited function. See Watts v. XL Sys., Inc., 232 F.3d 877, 880-81 (Fed. Cir. 2000). While the baffles in the '798 patent are clearly intended to perform several functions, the term "baffles" is nonetheless structural; it is not a purely functional placeholder in which structure is filled in by the specification.

*Phillips v. AWH Corp.*, 415 F.3d at 1311.

Cultec respectfully submits that the term "end wall" in claim 16 is not a "purely functional placeholder in which structure is filled in by the specification". Thus, in the same

way as in the *Phillips* case, the claim language in claim 16 of the DiTullio '151 patent should not be treated as a "means plus function" limitation. In claim 16, the claim language is "said latching system includes said one end wall as means to prevent spreading of adjoining galleries once latched to one another". The interpretation of this clause as a structural term is straightforward. Like in the *Phillips* case, where the Court concluded that "baffles" meant baffles regardless of their angle to the exterior wall, so here "one end wall" means one end wall, which works together with the overlapping rib latching system to prevent lateral spreading of a adjoining chambers, regardless of the presence or absence of lugs, notches, stepped support members, or vertical walls.

According to Infiltrator, the patent claims require stepped support members, stepped vertical walls, lugs and notches as required additional "means to prevent spreading" in addition to the end wall. However, contrary to Infiltrator's assertions, an explicit statement defining the scope of "means for preventing spreading of adjoining galleries once latched to each other" in claim 16 is provided in the July 1, 1991 "Amendment Under Rule 1.116" which states: "original claim 16, specifically defining the overlapping latched corrugated ribs shown in FIGURES 12 and 13 cooperating with the single end wall to stabilize the latched galleries and inhibit lateral spreading, was provisionally approved in the previous action of July 26, 1990, and it is now also presented here, rewritten specifically as independent claim 46." [App. at A897]. Mr. DiTullio's attorney made a specific statement about the meaning of this clause, narrowing it to mean *only* the end wall cooperating with the overlapping latched corrugated ribs, and specifically excluding lugs, or notches, or stepped support members, etc. as argued by Plaintiffs.

- 19 -

Given that claim 16 is not a "means plus function" claim, and that the explicit

meaning of the claim was explained by Mr. DiTullio's attorney, the only reasonable way to

interpret the claim is to read it as it would be read by a person of ordinary skill in the art.

The fundamental flaw in Infiltrator's suggested claim interpretation is that, instead of

acknowledging the plain meaning of the patent claims to a person of ordinary skill in the art,

Infiltrator relies on the prosecution history and argues that the claims which were actually

granted should be read as if they were different claims. More importantly, Infiltrator's

argument fails to recognize that the Examiner, in allowing the amended claims, was obliged

to determine:

> the scope of claims in patent applications not solely on the basis of the claim
> language, but upon giving claims their broadest reasonable construction "in light of
> the specification as it would be interpreted by one of ordinary skill in the art." In re
> Am. Acad. of Sci. Tech. Ctr., 367 F.3d 1359, 1364 (Fed. Cir. 2004).

*Phillips v. AWH Corp.*, 415 F.3d at 1316.

The Examiner, following this procedure, should have interpreted the claims as argued here

by Cultec, namely, that the end wall, working together with the overlapping rib latching

system, are the only required elements of claim 16 regarding prevention of spreading.

> This Federal Circuit noted in *Phillips* that:

> because the prosecution history represents an ongoing negotiation between the PTO
> and the applicant, rather than the final product of that negotiation, it often lacks the
> clarity of the specification and thus is less useful for claim construction purposes. See
> Inverness Med. Switz. GmbH v. Warner Lambert Co., 309 F.3d 1373, 1380-82 (Fed.
> Cir. 2002) (the ambiguity of the prosecution history made it less relevant to claim
> construction); Athletic Alternatives, Inc. v. Prince Mfg., Inc., 73 F.3d 1573, 1580
> (Fed. Cir. 1996) (the ambiguity of the prosecution history made it "unhelpful as an
> interpretive resource" for claim construction).

*Phillips v. AWH Corp.*, 415 F.3d at 1317.

The back and forth between Mr. DiTullio's patent attorney and the Examiner does not establish any intent or agreement to limit the scope of the patent claims as argued by Infiltrator. The prosecution history includes statements to the Examiner by Mr. DiTullio's attorney that the overlapping latched corrugated ribs cooperate with the single end wall to stabilize the latched galleries and inhibit lateral spreading. [App. at A897].

"In the absence of an express intent to impart a novel meaning to claim terms, an inventor's claim terms take on their ordinary meaning. We indulge a 'heavy presumption' that a claim term carries its ordinary and customary meaning. The ordinary meaning of a claim term may be determined by reviewing a variety of sources, including the claims themselves, other intrinsic evidence including the written description and the prosecution history, and dictionaries and treatises. But in any event the ordinary meaning must be determined from the standpoint of a person of ordinary skill in the relevant art." *Teleflex Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1319 (Fed. Cir. 2002) (citations omitted). Claim 16 should be given its ordinary and customary meaning, not an expansive construction which completely contradicts the express meaning defined by the Applicant during prosecution. Cultec submits that claim 16 means exactly what it says - that claim 16 specifies an end wall which works together with the overlapping rib latching system to prevent spreading of an overlying chamber. No additional elements are required by claim 16.

This conclusion is particularly clear when claim 16 is compared to claim 5. Claim 5 is nearly identical to claim 16 except as to the "said latching system" clause. In claim 5, the "said latching system" specifies "said latching system further including means to prevent spreading . . . . said spreading prevention means including at least one lug . . . ." In contrast, claim 16 claims "said latching system includes said one end wall as means to prevent spreading . . . ." Under the

doctrine of claim differentiation, the claims should normally be presumed to be claiming different components of the invention, not the exact same item.0.   Mr. DiTullio's patent attorney, Robert Ware, a long-time and very experienced Connecticut patent attorney, wrote these two claims to present separate claims for separate features.  He clearly meant for these two claims to be interpreted differently.  The doctrine of claim differentiation corroborates the claim interpretation proposed by Cultec using the plain-and-ordinary-meaning claim interpretation rule.

### C.    Claim 11 Is A Means Plus Function Claim But Does Not Require The Many Sub-Elements Argued By Infiltrator

Claim 11 of the DiTullio '151 patent claims two stormwater chambers connected together:

> "11.    In a drain field for allowing liquid to seep into adjoining ground,
> A. a first terminal gallery comprising:
> i. a first elongated main body portion having an arch-shaped configuration thereby creating an enlarged enclosure, said elongated main body portion having first and second ends;
> ii. first and second end walls respectively covering said first and second ends of said first elongated main body portion, each of said end walls having an opening therethrough for transporting the liquid to and from said first gallery; and
> iii. a first latching engagement system associated with said first end wall for attaching said terminal gallery to an adjoining gallery in an end-to-end engaged relationship, said latching engagement system including a first rib on said first terminal gallery main body portion adjacent said first end wall, said rib being dimensionally sized to mate engagingly with an associated rib on an adjoining gallery;
> B. a second adjoining drain field gallery having only one end wall at its distal end, comprising:
> i. a second elongated main body portion having an arch-shaped configuration thereby creating an enlarged enclosure, said second elongated main body portion having two opposed ends;
> ii. a third end wall covering one opposed distal end of said second elongated main body portion, said third end wall having an opening therethrough for transporting the liquid to an adjoining gallery; and

iii. a second latching engagement system associated with the other opposed proximal end for attaching said second adjoining gallery to said first terminal gallery in an overlapping end-to-end engaged relationship, said second latching engagement system including a second rib on said second adjoining gallery main body portion adjacent the other opposed proximal end, said second rib being dimensionally sized to vertically seat engagingly on said first rib of said first terminal gallery whereby said first and second galleries are engagingly latched together thereby preventing relative longitudinal movement therebetween, *said first and second latching systems further including means to prevent lateral spreading of said first terminal gallery and said second adjoining gallery once said galleries are latched to one another, including said first end wall inhibiting lateral spreading of said first gallery and of said adjoining second gallery and restraining said arch-shaped configuration against deformation*; and

C. a drain pipe extending through at least one of said openings in said first, second and third end walls for transporting liquid to the drain field." [App. at A11-12].

Essentially the same analysis is also applicable to claim 11 of the DiTullio '151 patent as applied to claim 16 above. The clause in issue in claim 11 reads: "said first and second latching systems further including *means to prevent lateral spreading* of said first terminal gallery and said second adjoining gallery once said galleries are latched to one another, *including said first end wall inhibiting lateral spreading of said first gallery and of said adjoining second gallery and restraining said arch-shaped configuration against deformation*." The "means to prevent lateral spreading" clause defines an end wall which prevents spreading of adjoining galleries once latched to one another. The only required element besides the end wall is the overlapping rib system of the latching systems. There may be *optional* additional elements, such as the lugs and notches described in the specification, but these are not required items under a proper claim interpretation. "Means to prevent lateral spreading" does not require a laundry list of an end wall *and* lugs *and* notches *and* stepped support members *and* vertical walls as argued by Plaintiffs. The additional lug and notch elements are optional additional elements that can be included but are not required for infringement of claim 11.  Claim 11 should be read

- 23 -

consistently with claim 16, and therefore "means for preventing lateral spreading" should mean an end wall which prevents spreading of adjoining galleries once overlapping ribs are latched to one another, without any additional *required* elements.

Plaintiffs' proposed means plus function claim construction relies heavily on the statement in the specification that

> To achieve the latching arrangement as shown in FIGS. 12 and 13, the end wall 28 (shown in dotted line) of gallery 10 is cut off with a razor along a cut line 68 and discarded. As shown in FIGS. 1, 6 and 14, the cut-line 68 cuts through stepped support members 70 and provides notch 72 in each of the base portions 26 of the gallery 10. Thereafter, the gallery 10 can be lifted and dropped to securely latch with the adjoining identical gallery 10A as shown in FIGS. 13 and 14 with rib 18 seating on rib 18A'. Rib 18A' of gallery 10A is identical to rib 18' of gallery 10. The end wall 30A from gallery 10A provides support for both galleries. The stepped support members 70 will be supported on the associated stepped vertical walls 20 on gallery 10A while notches 72 in the base portions 26 interfit with lugs 74A on the base portion 26A of gallery 10A thereby preventing the spread of the overlapping rib 18.

[App. at A10]. Cultec respectfully submits that the above statement, when read in its entirety, supports the conclusion that the "means to prevent lateral spreading" of claim 11 refers to the combination of end wall and overlapping ribs, and that the chamber may optionally be provided with lugs and notches in a lower flange area of the chamber (but not provided with stepped support members and vertical walls). The additional lug and notch features are optional additional features that can be included but are not required.

Infiltrator's strained claim construction is wrong because it shoehorns limitations into the claim which are not actually specified in the claim. Infiltrator is trying to make claim 11 contain the limitations of claims 5, 10 and/or 15, but this is not how patent claims are supposed to be read. Claims 5, 10 and 15 explicitly define a "means for preventing spreading" as lugs and their mating portions. But other claims, specifically claims 11 and 16 in issue in this case, as well as claim 14, explicitly define the "means for preventing spreading" as the end wall.

- 24 -

The claims in issue in this case are very clear. They should be interpreted literally, without importing a cluster of elements that are not present in the claims.

### D.    The "Opening" Claim Interpretation Issue

Plaintiffs argue that this Court decided that claim 11 requires that there be three end walls each with an opening into which a drainpipe can be inserted (Memorandum at 11), and that claim 16 requires an opening sized to accept a drainpipe which passes through the entire row of chambers. (Memorandum at 15).  To the extent the claim interpretation argument is an assertion that there must be a specific position for the openings, such as in the upper portion of the end walls, or a specific size measurement for the opening, Cultec disagrees strongly with such an assertion.  The openings are defined in claim 11 as:

> each of said end walls having an opening therethrough for transporting the liquid to and from said first gallery;

and further the claim specifies

> a drain pipe extending through at least one of said openings in said first, second and third end walls for transporting liquid to the drain field;

In claim 16, an opening is defined as follows:

> said at least one end wall having an opening therethrough dimensionally sized to accept a drainpipe for transporting the liquid to said gallery.

Infiltrator seems to be interpreting claim 16 to require not only an opening, but also a drainpipe, and not just a drainpipe, but one that extends through the length of all of the chambers. (Memorandum at 15)  This is a clearly erroneous attempt to import numerous elements into the claim that are simply not present.  Infiltrator's claim construction should be rejected.

- 25 -

### E.    The "Integral End Wall" Claim Interpretation Issue

Plaintiffs argue that claim 11 requires a chamber with two integral end walls (Memorandum at 7, 11).  It is clear that there is no such limitation included in either claim 11, nor was the question of an integral end wall an issue in the prosecution of the application which led to the '151 patent, nor is there any reason in the record to suggest that an integral end wall is necessary to the invention.  There is no statement in the written specification of the patent stating that the walls are integral.

## VI.    THERE ARE GENUINE ISSUES OF MATERIAL FACT REGARDING INFILTRATOR'S NON-INFRINGEMENT ALLEGATIONS

Infiltrator seeks summary judgment of non-infringement based on the alleged omission of only a few elements from the Old Chambers that Infiltrator argues are called for by claims 11 and 16.  However, Infiltrator is either wrong as a matter of law regarding the alleged omissions because they are not required by the claims in issue, or else wrong as matter of fact because the allegedly missing elements are actually present and there are genuine issues of material fact presented by the conflicting assertions of the parties as to the presence or absence of the allegedly missing elements.

### A.    Infiltrator Has Not Proven Non-Infringement Of Claim 16

Infiltrator asserts non-infringement of claim 16 based on the alleged omission of two elements: (1) lack of an opening in the closed end wall of the Old Chambers; and (2) lack of lugs, apertures, and stepped support members.  (Memorandum at 15.)  Infiltrator has not shown non-infringement by these arguments.

- 26 -

The claim that "[n]either the end walls of the accused devices nor the end plates contain an opening" (Memorandum at 15) is a remarkably misleading statement. Even Infiltrator's Local Rule 56(a)(1) Statement, at ¶10 confirms that "the closed end of the Old Chambers includes a semi-circular aperture at the bottom of the closed end." Infiltrator's Declarant, Bryan Coppes, admits that there is an opening in the closed end wall. *See* Rye Exhibit 2, the Declaration of Bryan Coppes, at ¶17. Infiltrator has not submitted any photos of its product in connection with its motion, apparently hoping that its product will not be looked at too closely. Cultec has therefore submitted Infiltrator's Installation Instructions [App. at A 24-31] as well as photographs of the Old Chambers. [App. at A14-23 and A32-37] Openings are quite clearly visible in the photographs of the Infiltrator product seen at Appendix pages A14-23, and A 26-31. These openings, sometimes called a "mousehole or a transfer opening which has the function of providing an opening for transport of stormwater to and from the chamber and is sometimes used by contractors as the opening to accept a drainpipe. [DiTullio Decl. ¶ 8] Clearly, there is a genuine issue of material fact regarding Infiltrator's allegation (Memorandum at 15) that there are no openings in the end walls of the Infiltrator Old Chambers.

Although unclear (*see* Memorandum at 15-16) Infiltrator's argument may be that the opening is not "dimensionally sized to accept a drainpipe." As noted above, this opening is in fact used to insert a drainpipe by contractors, and also as stated by Mr. DiTullio, it is of a size to accept a drainpipe, so there is a genuine issue of material fact regarding this allegation.

Moreover, besides the transfer opening, there is also a concentric group of circular cutaway zones in the end wall that are intended to be cut away to provide a hole of a selected size. Contractors are directed to cut away as needed in Infiltrator's Installation Instructions [App. at A25, A27, A30] to make a hole in the end plate so that a drain pipe can be inserted into

an opening. Infiltrator argues (Memorandum at 16) that there is no such opening in their Old Chambers (Memorandum at 16), but in view of the explicit directions of the installation instructions to cut a hole in the end plate there is a genuine issue of material fact whether such instructions, either (1) of themselves, because they explicitly direct cutting an opening in the concentric series of circular cutaway zones in the end plate; or (2) because they encourage cutting an opening in the identical in the concentric series of circular cutaway zones in the end wall.

In addition, the assertion (Memorandum at 16) that Infiltrator did not know of the DiTullio '151 patent and that the Old Chambers infringed the patent is also a misstatement. Infiltrator knew of the DiTullio '151 patent long before it first sold the chambers and even negotiated with Mr. DiTullio for a patent license. [App. at A1690-96, A1743-44, A1967-68]. There is a genuine issue of material fact about Infiltrator's claimed lack of knowledge and intent in proceeding with the sale of the Old Chambers despite an intimate knowledge of the patent. Infiltrator's knowledge evidences a willful and intentional infringement, not an innocent mistake.

The assertion of non-infringement of claim 16 based on the statement that "none of the accused devices have a lug, aperture, stepped supported members or equivalents" is completely off the point. (Memorandum at 15). Claim 16 does not require a lug, aperture, stepped supported members or equivalents. *See supra* at pp. 19-21. Claim 16 does not recite these elements. The presence or absence of these elements is completely irrelevant. No person of ordinary skill in the art would read claim 16 to require these elements.

**B.      Infiltrator Has Not Proven Non-Infringement Of Claim 11**

Infiltrator asserts non-infringement of claim 11 based on the alleged omission of four elements:(1) lack of lugs, apertures, and stepped support members (2) lack of first and second end walls in a first chamber in a row and further the lack of openings in these end walls; and (3) the lack of inhibition of lateral spreading and restraining deformation related to the presence of an end wall (Memorandum at 11); and (4) Infiltrator does not induce customers to infringe (Memorandum at 12-13).  Infiltrator has not shown non-infringement by these arguments.

As with claim 16, the assertion of non-infringement of claim 11 based on the statement that "the accused devices do not contain the lug, stepped support members, vertical support walls or notches" (Memorandum at 11) reflects a warped and improper understanding of the elements of claim 11.  Claim 11 does not require a lug, aperture, stepped supported members or equivalents.  Claim 11 does not recite these elements.  The presence or absence of these elements is completely irrelevant.  No person of ordinary skill in the art would read claim 11 to require these elements.  So Infiltrator's argument does not prove noninfringement.  If anything, the weakness of this argument simply confirms the fact that Infiltrator has no valid noninfringement argument.

The argument about the lack of first and second end walls in the first chamber in a row is equally unconvincing.  Infiltrator concedes that its chambers have one closed end and one open end, and that in the open end an "end plate" can be installed in the first chamber in a row. [Local Rule 56(a)(1) Statement at ¶¶9, 13].  The installation instructions for the Old Chambers instruct contractors to install the "end plate" in the first chamber in a row [App. at A27, A30].  Infiltrator's warranty [App. at A31] treats the two components as a unitary whole.  Infiltrator nevertheless argues that its end plate is not an "end wall" as called for by the claims because it

- 29 -

is not an integrally molded wall. However, as noted *supra*, at pp. 25-26, there is no requirement in claim 11 that both walls in the first chamber in a row need to be integrally molded. Any juror could easily decide that there are in fact two walls provided by Infiltrator in the first chamber in a row. The argument about lack of openings in these two walls is equally unconvincing, because any juror can easily see that there is an opening in the closed end of the old Chambers [*see* App. at A 14-32]. The transfer opening has the function of providing an opening for transport of stormwater to and from the chamber and is sometimes used by contractors as the opening to accept a drainpipe. [DiTullio Decl. ¶ 8]. Moreover, as already discussed, in addition to the transfer opening, there are also concentric groups of circular cutaway zones in both the integral closed end wall and the separate end wall ("end plate") of the Old Chambers. These cutaway zones are intended to be cut away to provide a hole of a selected size. Contractors are explicitly directed to cut away as needed in Infiltrator's Installation Instructions App. at A25, A27, A30]. Clearly, there is a genuine issue of material fact regarding Infiltrator's allegation that there are no openings in the end walls of the Infiltrator Old Chambers because a reasonable jury could find there are openings or that Infiltrator has induced cutting of openings by its directions to Contractors. .

The argument that there is a lack of inhibition of lateral spreading and restraining deformation related to the presence of an end wall in the Infiltrator Old Chambers is an extremely fact-intensive determination. Infiltrator's argument relies solely on the Second Declaration of Mr. Coppes (Rye Decl. Ex. 7) to describe some informal testing. Mr. Coppes has not been qualified as an expert in testing chambers. He has never submitted any expert report in this case, and has never been deposed about his alleged testing. This Court cannot

accept his alleged test data as none of the predicate grounds for consideration of such evidence have been provided.

There is no expert report, no *Daubert* qualification of the described test methods. Mr. Coppes fails to provide sufficient detailed information to allow anyone to assess the reliability, reproducibility and robustness of the testing conducted by Infiltrator. There are no photographs or description of the test equipment and no identification of who conducted the testing, or how the measurements were made, or what instruments were used or whether the exercise was performed more than once. It is therefore impossible to assess whether and to what extent Infiltrator followed practices that would have allowed an unbiased person to collect useful data or arrive at a relevant, unbiased conclusion. No test data has been provided. Moreover, Infiltrator did not give any advanced notice to Cultec that Infiltrator would be conducting a "testing" exercise and did not invite anyone from Cultec to observe the "tests". No one from Cultec was asked to participate in the design of the exercise or to ensure that an unbiased, fair and objective method would be employed. Cultec was not given any opportunity to inspect the Old Chambers Infiltrator claims to have tested to determine their condition and whether they were defective or deformed in any way at the time of the exercise. Mr. Coppes' declaration does not indicate what Infiltrator did after the exercise with the Old Chambers it supposedly tested.

Accordingly, Cultec moves to strike Paragraphs 12-15 of the Second Declaration of Bryan A. Coppes as seeking to present expert testimony without any adequate basis therefore.

In any event, a reading of Mr. Coppes declaration reveals that the test results were far less conclusive than the overblown characterization given them in Infiltrator's Memorandum. At most, all he can say is that the end wall "does not prevent spreading of the Old Chambers in any *meaningful* way." (Rye Decl. Ex. 7, ¶14). However flawed the testing was, the submitted

graphs still show that there is a difference in spreading in the tests, and that there was less spreading at the end of the chamber with the end wall, at every temperature range, but most particularly at higher temperatures.  Mr. Coppes declaration and the graphs show that the end wall **did** prevent spreading.   But in Mr. Coppes view that prevention of spreading was not "meaningful."   Cultec submits that given the admitted prevention of spreading, there is a genuine issue of material fact about the contention that the end wall does not prevent spreading. Surely, the issue of whether the amount of spreading prevented is sufficient to meet the patent claims is an issue for the jury to decide.

The existence of a genuine issue of material fact is confirmed by the contradictory statement of Mr. DiTullio that in his view the end walls of the Infiltrator Old Chambers do serve to prevent spreading.  There is a genuine issue of material fact regarding whether the end walls and end plates of the Old Chambers do not prevent lateral spreading of the Old Chambers.  (*See* DiTullio Decl. ¶¶ 10, 11, 13; App. at A14-23 (photos); A24-31 (Old Chamber brochures); A32-37 (photos);  A1700-1710,  A1732-1733,  A1745,  A1963-1967,  A1985-1986,  A2015-2024 (hearing transcript)).

Lastly, the argument about non-inducement does not succeed because there are genuine issues of material fact.  Infiltrator's claimed lack of knowledge and intent in proceeding with the sale of the Old Chambers despite an intimate knowledge of the patent is inconsistent with its admissions. *See supra* at 28.

## VII.   CONCLUSION

Infiltrator is either wrong as a matter of law regarding the alleged omissions because they are not required by the claims in issue, or else wrong as matter of fact because the allegedly

missing elements are actually present and there are genuine issues of material fact presented by

the conflicting assertions of the parties as to the presence or absence of the allegedly missing

elements.  The Motion for Summary Judgment of NonInfringement should be denied.

Respectfully submitted,

May 1, 2006
Date

Stephen P. McNamara (ct 01220)
James P. Jeffry
ST. ONGE STEWARD JOHNSTON & REENS LLC
986 Bedford Street
Stamford, CT  06905
Telephone (203) 324-6155
Facsimile (203) 327-1096
Email: lit@ssjr.com

Attorneys for Defendants
CULTEC, INC. and ROBERT J. DITULLIO

## CERTIFICATE OF SERVICE

This is to certify that a true copy of the foregoing

### DEFENDANTS' OPPOSITION TO PLAINTIFFS'
### MOTION FOR SUMMARY JUDGMENT

is being served, by First Class Mail, postage prepaid, on the date indicated below, on the following counsel for Plaintiffs by depositing the same with the U.S. Postal Service, in envelopes addressed to:

Michael Rye
Cantor Colburn LLP
55 Griffin Road South
Bloomfield, CT 06002

Date: 5/1/06