## C.    The District Court Erred in Its Claim Construction

The step of claim construction involves a determination of "what it is that has been patented", *i.e.*, what are the literal metes and bounds of the invention set forth in the patent claims.   This step, often referred to as "claim interpretation" or "claim construction", is a matter of law for resolution by the trial court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*in banc*), *aff'd*, 517 U.S. 370 (1996). The claim construction analysis begins with the language of the claims. *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed Cir. 1999). As a general rule, all terms in a patent claim are to be given their plain, ordinary and accustomed meaning to one of ordinary skill in the relevant art. *Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1299 (Fed. Cir. 1999) ("[W]ords in patent claims are given their ordinary meaning in the usage of the field of the invention, unless the text of the patent makes clear that a word was used with a special meaning."); *Johnson Worldwide Assocs.*, 175 F.3d at 989.  In addition, unless compelled to do otherwise, a court will give a claim term the full range of its ordinary meaning as understood by an artisan of ordinary skill. *Johnson Worldwide Assocs.*, 175 F.3d at 989; *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 985-88 (Fed. Cir. 1988) (term "plasticizer" given full range of ordinary and accustomed meaning to those of ordinary skill in the arts of polymer chemistry and the plastics industry).

Once a disputed claim term is identified by the parties and its plain meaning to the ordinarily skilled artisan is ascertained by the court, the next step is to examine the written description and the drawings to confirm that the patentee's use of the disputed terms is consistent with the meaning given to it by the court. *Watts v. XL Sys, Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) ("Claims must be read in view of the specification, of which they are a part."), *aff'd*, 517 U.S. 370 (1996). This confirmatory step is necessary for several reasons. First, patent law permits the patentee to choose to be his or her own lexicographer by clearly setting forth an explicit definition for a claim term that could differ in scope from that which would be afforded by its ordinary meaning. *Mycogen Plant Science v. Monsanto Co.*, 243 F.3d 1316, 1327 (Fed. Cir. 2001) ("[A] patentee is free to be his own lexicographer, so long as the special definition of a term is made explicit in the patent specification or file history."). After examining the written description and the drawings, the same confirmatory measure must be taken with the prosecution history, since statements made during the prosecution of a patent may affect the scope of the invention. *See Biodex Corp. v. Loredan Biomedical, Inc.*, 946 F.2d 850, 862-63 (Fed. Cir. 1991) (affirming the use of prosecution history to construe a claim).

In following this process, the Court should not fall into the trap of thinking that the patent claims are limited to the specific embodiment described in the patent. This Court has recently reiterated several times that:

> [A]n applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention. *See SRI Int'l v. Matsushita Elec. Corp. of America*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). "[I]f structural claims were to be limited to devices operated precisely as a specification-described embodiment is operated, there would be no need for claims. Nor could an applicant, regardless of the prior art, claim more broadly than that embodiment." *Id.* In short, it is the claims that measure the invention, as informed by the specification. As we noted long ago: "Specifications teach. Claims claim." *Id.* at 1121 n.14, 585 n.14.

*Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001).

Where a claim includes "means plus function" claim language, the "means plus function" elements are to be interpreted according to 35 U.S.C. § 112, Paragraph 6:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

As such, "[s]ection 112, ¶6 limits the broad language of means-plus-function limitations in combination claims to equivalents of the structures, materials, or acts in the specification." *Valmont Indus., Inc. v. Reinke Mfg. Co., Inc.*, 983 F.2d 1039, 1043-44 (Fed. Cir. 1993). Construing means-plus-function claim limitations is a

two-step process. The Court must first define the particular _function_ of the claim

phrase. _See Micro Chem., Inc. v. Great Plains Chem. Co.,_ 194 F.3d 1250, 1257-58

(Fed. Cir. 1999).  Second, the Court must identify the corresponding structure,

material, or acts described in the specification which can perform that function.  _Id._

at 1258.

Defendants have alleged infringement of claims 16 and 11 by Plaintiffs.  The

claim language highlighted in bold below is the contested language of the claims.

Claim 16 of the DiTullio '151 patent claims one stormwater chamber by itself:

"16.    A drain field gallery for guiding liquid through a drain field and
allowing liquid to seep into adjoining ground comprising:
    A.    an elongated main body portion having a corrugated arch-shaped
configuration thereby creating an enlarged enclosure with a plurality of
upstanding ribs spaced apart longitudinally therealong;
    B.    at least one end wall covering one end of said elongated main
body portion, said at least one end wall having an opening therethrough
dimensionally sized to .accept a drainpipe for transporting the liquid to said
gallery;
    C.    a latching engagement system associated with said at least one
end wall for attaching said gallery to an adjoining gallery in an end-to-end
engaged relationship, said latching system being dimensionally sized to
vertically seat in latching engagement on the latching system of the adjoining
gallery and to inhibit relative longitudinal movement between the galleries,
**_said at least one end wall inhibiting lateral spreading of said gallery and of
said adjoining gallery and restraining said arch-shaped configuration
against deformation_**, wherein said latching engagement system is provided by
end ribs of said plurality of ribs, and said end ribs are adjacent the terminal
ends of said main body portion and are dimensionally sized to mate
engagingly with end ribs on adjoining galleries,
**_whereby said latching system includes said one end wall as means to prevent
spreading of adjoining galleries once latched to one another._**" [A0015]

Claim 11 of the DiTullio '151 patent claims two stormwater chambers connected together:

"11.    In a drain field for allowing liquid to seep into adjoining ground,
  A. a first terminal gallery comprising:
  i. a first elongated main body portion having an arch-shaped configuration thereby creating an enlarged enclosure, said elongated main body portion having first and second ends;
  ii. first and second end walls respectively covering said first and second ends of said first elongated main body portion, each of said end walls having an opening therethrough for transporting the liquid to and from said first gallery; and
  iii. a first latching engagement system associated with said first end wall for attaching said terminal gallery to an adjoining gallery in an end-to-end engaged relationship, said latching engagement system including a first rib on said first terminal gallery main body portion adjacent said first end wall, said rib being dimensionally sized to mate engagingly with an associated rib on an adjoining gallery;
  B. a second adjoining drain field gallery having only one end wall at its distal end, comprising:
  i. a second elongated main body portion having an arch-shaped configuration thereby creating an enlarged enclosure, said second elongated main body portion having two opposed ends;
  ii. a third end wall covering one opposed distal end of said second elongated main body portion, said third end wall having an opening therethrough for transporting the liquid to an adjoining gallery; and
  iii. a second latching engagement system associated with the other opposed proximal end for attaching said second adjoining gallery to said first terminal gallery in an overlapping end-to-end engaged relationship, said second latching engagement system including a second rib on said second adjoining gallery main body portion adjacent the other opposed proximal end, said second rib being dimensionally sized to vertically seat engagingly on said first rib of said first terminal gallery whereby said first and second galleries are engagingly latched together thereby preventing relative longitudinal movement therebetween, *said first and second latching systems further including means to prevent lateral spreading of said first terminal gallery and said second adjoining gallery once said galleries are latched to one another, including said first end wall inhibiting lateral spreading of said first gallery and of said adjoining second gallery and restraining said arch-shaped configuration against deformation*; and

- 21 -

C. a drain pipe extending through at least one of said openings in said first, second and third end walls for transporting liquid to the drain field." [A0013-14].

In this appeal, Defendants contend that the disputed language means exactly what it says – that claim 16, when it specifies *"one end wall as means to prevent spreading of adjoining galleries once latched to one another,"* explicitly specifies means that the one end wall is the means to prevent spreading.[1]

The district court erred in its claim construction by limiting the scope of the claims to require a laundry list of specific components disclosed in the specification. In particular, the district court adopted the Plaintiffs' claim construction. According to the Plaintiffs, the patent claims require stepped support members, stepped vertical walls, lugs and notches as required additional "means to prevent spreading" in addition to the end wall. This assertion is based solely on a few lines in the patent specification:

> The stepped support members 70 will be supported on the associated stepped vertical walls 20 on gallery 10A while notches 72 in the base portions 26 interfit with lugs 74A on the base portion 26A of gallery 10A thereby preventing the spread of the overlapping rib 18."

[A0012, Col 5, line 66-Col. 6, line 2].

---

[1]  The language of claim 16 is so specific in defining the "end wall as means to prevent to prevent spreading" that there is the possibility that this language should not even be construed as a "means plus function" clause, however, whether treated as a conventional structural element, or a means plus function element, the same interpretation should be applied.

This paragraph says that the notches and lugs prevent the spread of the *overlapping rib*. This paragraph does not say that they are the *"means"* for "preventing spreading of *adjoining galleries once latched to each other*" as called for by claim 16. At best, this paragraph only explains that the notches and lugs which prevent spreading of the *ribs* could also be of some assistance in preventing spreading of *adjoining galleries* (which is what claim 16 calls for), but this is not explicitly stated in the specification.

The explicit statement defining the scope of "means for preventing spreading of adjoining galleries once latched to each other" in claim 16 is provided in the July 1, 1991 "Amendment Under Rule 1.116" which states: "original claim 16, specifically defining the overlapping latched corrugated ribs shown in FIGURES 12 and 13 cooperating with the single end wall to stabilize the latched galleries and inhibit lateral spreading, was provisionally approved in the previous action of July 26, 1990, and it is now also presented here, rewritten specifically as independent claim 46." [A897]. Mr. DiTullio's attorney made a specific statement about the meaning of the "means" clause, narrowing it to mean *only* the end wall cooperating with the overlapping latched corrugated ribs, and specifically excluding other "means" that might be disclosed in the specification.

The file history fully supports the specific language used in claim 16. Claim 16 specifies "whereby said latching system includes said one end wall as means to prevent spreading of adjoining galleries once latched to one another." Clearly the

claim language says that the end wall is the means to prevent spreading.  The claim does not require lugs, or notches, or stepped support members, etc. as argued by Plaintiffs.

If "means to prevent spreading" means an end wall+lugs+notches+stepped support members+vertical walls as argued by Plaintiffs, the claim would make no sense.  Plaintiffs' interpretation of the claim, using "means to prevent spreading" as a shorthand for the list of all possible components would mean that the claim should be read to mean: "whereby said latching system includes said one end wall as an end wall+lugs+notches+stepped support members+vertical walls to prevent spreading once latched to one another."  Grammatically, this makes no sense.

The prosecution history reflects a situation where the Examiner was requiring that claims be put in the proper format – a means plus function format – in order to be allowable.  The Examiner was not going to accept functional language.  A claim to patentable structure was required.  The means plus function language provided the structure.  Even though the unacceptable functional language appears similar to the acceptable means plus function language, as a matter of patent law and practice it was and is different.  M.P.E.P. §2114.  This change is what placed the application in order for allowance.

The amendment adding claim language from original claim 16 to the base claim did not add a plethora of lugs, notches, stepped side walls etc. to the claim as

argued by Plaintiffs.  It simply placed the claim language in the correct acceptable "means plus function" form.

Furthermore, at the time of the prosecution of the DiTullio '151 patent, it was the policy of the U.S. Patent Office to read "means plus function" claim language as broadly as possible.  M.P.E.P. §2181.  Plaintiffs' patent expert confirmed that, at the time of the application, the Examiner would have been required to read the "means plus function" patent claim language as broadly as possible. [A1881-1882].  The broadest way to read the clause "whereby said latching system includes said one end wall as means to prevent spreading of adjoining galleries once latched to one another" is to read it simply and solely as an end wall that prevents spreading of adjoining galleries once the overlapping corrugated ribs are latched to one another.  This was also confirmed by Plaintiffs' expert [A1875-1876].

The only claim interpretation that makes sense is Defendants' interpretation, namely, that where the claim says "said one end wall as means to prevent spreading" that the claim means just that: *the end wall*, which works in combination with the latched overlapping ribs, *is the means*.  The prosecution history of the patent confirms that the phrase "whereby said latching system includes said one end wall as means to prevent spreading of adjoining galleries once latched to one another" of

claim 16 defines an end wall which prevents spreading of adjoining galleries once the overlapping ribs are latched to one another, without any additional required elements.

"In the absence of an express intent to impart a novel meaning to claim terms, an inventor's claim terms take on their ordinary meaning. We indulge a 'heavy presumption' that a claim term carries its ordinary and customary meaning. The ordinary meaning of a claim term may be determined by reviewing a variety of sources, including the claims themselves, other intrinsic evidence including the written description and the prosecution history, and dictionaries and treatises. But in any event the ordinary meaning must be determined from the standpoint of a person of ordinary skill in the relevant art." *Teleflex Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1319 (Fed. Cir. 2002) (citations omitted). Claim 16 should be given its ordinary and customary meaning, not an expansive construction which completely contradicts the express meaning defined by the Applicant during prosecution.

Essentially the same analysis is also applicable to claim 11 of the DiTullio '151 patent as applied to claim 16 above. The clause in issue in claim 11 reads: "said first and second latching systems further including ***means to prevent lateral spreading*** of said first terminal gallery and said second adjoining gallery once said galleries are latched to one another, ***including said first end wall inhibiting lateral spreading of said first gallery and of said adjoining second gallery and***

*restraining said arch-shaped configuration against deformation.*" This clause once again defines an end wall which prevents spreading of adjoining galleries once latched to one another, and does not require any additional elements.

Claim 11 does not have the same prosecution history statement of the meaning of this clause as is present in the prosecution history for claim 16. Under usual claim interpretation principles, a claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent. *See Phonometrics, Inc. v. Northern Telecom Inc.*, 133 F.3d 1459, 1465 (Fed. Cir. 1998) ("A word or phrase used consistently throughout a claim should be interpreted consistently."); *CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1159 (Fed. Cir. 1997) ("[W]e are obliged to construe the term 'elasticity' consistently throughout the claims."); *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1579 (Fed. Cir. 1995) (holding that claim terms found in different claims should be interpreted consistently).

Under this claim interpretation principle, claim 11 should be read consistently with claim 16, and therefore "means for preventing lateral spreading" should mean an end wall which prevents spreading of adjoining galleries once overlapping ribs are latched to one another, without any additional *required* elements. There may be *optional* additional elements, such as the lugs and notches

described in the specification, but these are not required items under a proper claim interpretation.

The language of claim 11, calling for "means to prevent lateral spreading of said first terminal gallery and said second adjoining gallery once said galleries are latched to one another, including said first end wall inhibiting lateral spreading of said first gallery and of said adjoining second gallery and restraining said arch-shaped configuration against deformation" should be interpreted slightly differently than claim 16 which is more explicit in limiting the claim to an end wall: "said latching system includes said one end wall as means to prevent spreading of adjoining galleries once latched to one another."

Clearly, the claim construction arrived at by the district court with regard to claim 11 is incorrect. "Means to prevent lateral spreading" does not define a laundry list of an end wall+lugs+notches+stepped support members+vertical walls as argued by Plaintiffs and adopted by the district court. The only reasonable construction of the means clause of claim 11, other than a construction specifying an end wall cooperating with the overlapping latched corrugated ribs, is that it specifies the combination of end wall and overlapping ribs in chambers, and that the chamber may optionally provided with lugs and notches in a lower flange area of the chamber (but not stepped support members and vertical walls). The

additional lug and notch elements are optional additional elements that can be included but are not required for infringement of claim 11.

Accordingly, the district court erred in its claim interpretation by adopting the Plaintiffs' proposed interpretation of the claims, instead of interpreting the claims as literally written and as specifically defined in the prosecution history.

**D.      The District Court Erred in Determining That Plaintiffs' Chambers Do Not Infringe the DiTullio '151 Patent**

The district court applied the erroneous claim construction to find that there was no infringement of the DiTullio '151 patent despite the presence of all of the elements of claims 11 and 16 of the patent, including the end walls which act to "prevent spreading/prevent lateral spreading" in Plaintiffs' chambers. Plaintiffs' "old 3050" chambers are open-bottomed, arch-shaped, corrugated rib stormwater storage chambers. They meet all of the claim elements of the preamble and part A of claim 16 [A0015], which read:

> "16.   A drain field gallery for guiding liquid through a drain field and allowing liquid to seep into adjoining ground comprising:
> A.     an elongated main body portion having a corrugated arch-shaped configuration thereby creating an enlarged enclosure with a plurality of upstanding ribs spaced apart longitudinally therealong."

The chambers have one open end, and an integral end wall on one closed end. The end wall has a "mouse hole" provided at its lower end which is used to receive a drainpipe. The end wall also has a concentric group of scalloped areas intended to

be cut away to provide a hole of a selected size, and contractors are directed to cut away the scalloped areas to make a hole for a drainpipe. Therefore, the chambers have all of the elements of Part B of claim 16, which specifies:

> "B.    at least one end wall covering one end of said elongated main body portion, said at least one end wall having an opening therethrough dimensionally size to accept a drainpipe for transporting the liquid to said gallery."

The open end of the "old 3050" chamber is intended to be fitted over the closed end of the adjoining chamber. When adjoining chambers are connected together in this way, the inner surface of a larger sized rib on the open end of the chamber fits over and latches onto the outer surface of a smaller rib at the closed end of the adjoining chamber and the end wall prevents spreading of the chamber. [A1608-1611] (*see supra*, pp. 10-11). Therefore, the chambers have all of the elements of Part C of claim 16, which specifies:

> "C.    a latching engagement system associated with said at least one end wall for attaching said gallery to an adjoining gallery in an end-to-end engaged relationship, said latching system being dimensionally sized to vertically seat in latching engagement on the latching system of the adjoining gallery and to inhibit relative longitudinal movement between the galleries, said at least one end wall inhibiting lateral spreading of said gallery and of said adjoining gallery and restraining said arch-shaped configuration against deformation, wherein said latching engagement system is provided by end ribs of said plurality of ribs, and said end ribs are adjacent the terminal ends of said main body portion and are dimensionally sized to mate engagingly with end ribs on adjoining galleries,
> whereby said latching system includes said one end wall as means to prevent spreading of adjoining galleries once latched to one another."

In the same way, all of the elements specified in claim 11 are present in the Plaintiffs' "old 3050" chambers. Claim 11 essentially defines the chamber of claim 16, but specifies two chambers, a first chamber in a row which has two end walls, and an adjacent second chamber. An additional element, a drain pipe, is inserted into one of the openings in one of the three walls of the two chambers. The additional evidence that supports a finding of infringement, even with these additional elements, is the evidence of the separate end plate sold with and intended to fit into the open end of the chamber if the chamber is at the end of the row, as described in the Plaintiffs' instructions, as well as Plaintiffs' instructions to insert a pipe into the end plate. [A1610] (*see supra*, p. 11).

The foregoing establishes ample basis for a finding of both direct and induced infringement.

A person induces infringement of a patent by actively and knowingly aiding and abetting another's direct infringement. "Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. §271(b). A party is liable for inducing infringement of a patent if the following are satisfied: (1) there is direct infringement; (2) the party accused of inducing infringement had actual or constructive knowledge of the existence of the patent; and (3) the party accused intended to induce infringement by actively participating in the line of conduct that caused the direct infringement. *Joy Technologies, Inc. v. Flakt, Inc.*, 6

F.3d 770, 774 (Fed. Cir. 1993) ("Liability for either active inducement of infringement or for contributory infringement is dependent upon the existence of direct infringement."); *Water Technologies, Corp. v. Calco, Ltd.*, 850 F.2d 660, 667 (Fed. Cir. 1988) ("While proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice.").

In order to be liable for inducement to infringe a patent, there must be direct patent infringement. "The principle of liability for aiding and abetting the wrongful acts of others is not imposed . . . to make illegal an act that was not illegal when it was done." *National Presto Industries, Inc. v. The West Bend Co.*, 76 F.3d 1185, 1193 (Fed. Cir. 1996).

The second factor requires that the inducer be aware of the existence of the patent. Although 271(b) does not use the word "knowing", the case law and legislative history uniformly assert such a requirement. 4 D. Chisum, *Chisum on Patents* §§17.04[2], [3].

The third factor for inducing infringement is that the infringer knowingly aided and abetted another's direct infringement. "[A] person infringes by actively and knowingly aiding and abetting another's direct infringement." *Water Technologies*, 850 F.2d at 667. The infringer must intend to induce infringement. This is evidenced by the infringer taking affirmative steps towards bringing about the direct infringement. Intent may be shown by specific, direct evidence or circumstantial

evidence.  When using circumstantial evidence to show intent, courts may infer intent based upon all the circumstances.  *Id.*  "Intent is a factual determination particularly within the province of the trier of fact."  *Allen Organ Co. v. Kimball Int'l, Inc.*, 839 F.2d 1556, 1567 (Fed. Cir. 1988).

In this case, if Plaintiffs are not the direct infringers of the patent, clearly the contractors who install the chambers in accordance with Plaintiffs' instructions are direct infringers.  Plaintiffs had clearly studied the DiTullio '151 patent (they had even negotiated for a license of it) prior to the time of entering the market (*see supra*, p. 5).  Plaintiffs provide installers with clear sets of directions about how to modify their chambers and install them.  Products installed in accordance with these directions will have all of the elements called for in the claims. Accordingly, Plaintiffs are liable for inducing infringement, in addition to their direct infringements, by their making and selling chambers in accordance with the DiTullio '151 patent claims.

## XI.  CONCLUSION

The district court's rulings denying preliminary injunction should be vacated, a correct claim interpretation provided, and a mandate directing entry of a preliminary injunction should be issued.

Respectfully submitted,

July 5, 2005
Date

Stephen P. McNamara
ST. ONGE STEWARD JOHNSTON & REENS LLC
986 Bedford Street
Stamford, CT 06905
Telephone: (203) 324-6155
Facsimile: (203) 327-1096

Attorneys for Defendants-Appellants

**XII.**     <u>**ADDENDUM**: 3/29/05 ENDORSEMENT ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION AND 3/30/05 ENDORSEMENT ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-------------------------------------x
INFILTRATOR SYSTEMS, INC. and        :
STORMTECH, INC.,                     :
                                     :
        Plaintiffs and Counter       :
        Defendants,                  :
v.                                   :
                                     : Civ No. 3:01CV2188 (AWT)
CULTEC, INC. and ROBERT J.           :
DiTULLIO,                            :
                                     :
        Defendants, Counter Claimants, :
        and Third Party Plaintiffs,  :
v.                                   :
                                     :
JAMES M. NICHOLS and FABRI-FORM      :
CO., INC.,                           :
                                     :
        Third Party Defendants.      :
-------------------------------------x
```

## ENDORSEMENT ORDER

The court informed the parties at the last status conference, held on February 14, 2005, that it has concluded that the plaintiffs' chambers do not infringe the '151 Patent. Accordingly, the defendants' motion for reconsideration (Doc. No. 50) was GRANTED, and in light of the court's conclusion referenced above, the defendants' motion for preliminary injunction (Doc. No. 50) is hereby DENIED.

It is so ordered.

Dated this 29th day of March 2005, at Hartford, Connecticut.

_____/s/_____
Alvin W. Thompson
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
----------------------------------x
INFILTRATOR SYSTEMS, INC. and      :
STORMTECH, INC.,                   :
                                   :
       Plaintiffs and Counter      :
       Defendants,                 :
v.                                 :  Civ No. 3:01CV2188 (AWT)
                                   :
CULTEC, INC. and ROBERT J.         :
DiTULLIO,                          :
                                   :
       Defendants, Counter Claimants, :
       and Third Party Plaintiffs, :
v.                                 :
                                   :
JAMES M. NICHOLS and FABRI-FORM    :
CO., INC.,                         :
                                   :
       Third Party Defendants.     :
----------------------------------x
```

## ENDORSEMENT ORDER

The court informed the parties at the last status conference, held on February 14, 2005, that it has concluded that the plaintiffs' chambers do not infringe the '151 Patent. Accordingly, the defendants' supplemental motion for preliminary injunction (Doc. No. 71) is hereby DENIED.

It is so ordered.

Dated this 30th day of March 2005, at Hartford, Connecticut.

                    _____/s/_____
                    Alvin W. Thompson
                    United States District Judge

## XIII.   CERTIFICATE OF SERVICE

This is to certify that two true and accurate copies of the foregoing
OPENING BRIEF OF DEFENDANTS-APPELLANTS is being served on July 5,
2005 by Federal Express, postage prepaid, on the following counsel:

> Michael Rye
> Daniel E. Bruso
> Cantor Colburn LLP
> 55 Griffin Road South
> Bloomfield, CT 06002

Date: July 5, 2005

Stephen P. McNamara

## XIV.   CERTIFICATE OF COMPLIANCE WITH RULES 32(a)(7)(B) AND (C), Fed. R. App. P.

I hereby certify that this OPENING BRIEF OF DEFENDANTS-

APPELLANTS complies with the type volume limitation of Rule 32(a)(7)(B), Fed.

R. App. P. and contains 8,705 words in compliance with Rule 32(a)(7)(C).

Dated: July 5, 2005

Stephen P. McNamara
St. Onge Steward Johnston & Reens LLC
986 Bedford Street
Stamford, Connecticut  06905-5619
Telephone: (203) 324-6155

- 36 -