**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
------------------------------------x
                                    :
INFILTRATOR SYSTEMS, INC. and       :
STORMTECH, INC.,                    :
                                    :
        Plaintiffs,                 :
                                    :
v.                                  :
                                    :
CULTEC, INC. and ROBERT J.          :
DiTullio,                           :
                                    : Civ No. 3:01CV2188 (AWT)
        Defendants.                 :
                                    :
------------------------------------
CULTEC, INC. and ROBERT J.          :
DiTullio,                           :
                                    :
        Counterclaimants and        :
        Third Party Plaintiffs,     :
v.                                  :
                                    :
INFILTRATOR SYSTEMS, INC.,          :
STORMTECH, INC.,                    :
                                    :
        Counterclaim Defendants, and :
                                    :
JAMES M. NICHOLS and FABRI-FORM     :
CO., INC.,                          :
                                    :
        Third Party Defendants.     :
                                    :
------------------------------------x
```

<u>**RULING ON MOTION FOR SUMMARY JUDGMENT**</u>

Plaintiffs and counterclaim defendants Infiltrator Systems
Inc. ("Infiltrator") and Stormtech Inc. ("Stormtech")brought this
action seeking a declaratory judgment of non-infringement of
United States Patent No. 5,087,151 (the "'151 Patent").
Defendants and third-party plaintiffs Cultec Inc. ("Cultec") and

Robert J. DiTullio ("DiTullio"), filed a counterclaim and a third party complaint alleging infringement of Claims 11 and 16 of the '151 Patent.  Infiltrator, Stormtech, and third party defendant James M. Nichols ("Nichols") have moved for summary judgment, and their motion is being granted.

## I. FACTUAL BACKGROUND

### A. The '151 Patent

The '151 Patent is entitled "Drainage System." On January 30, 1989, inventor DiTullio submitted his original patent application to the U.S. Patent and Trademark Office ("PTO"). After numerous amendments, the patent issued on February 11, 1992.  The patent relates to an underground drainage chamber, also known as a gallery, used to direct the flow of storm water or waste water.  Defendant Cultec manufactures and sells a number of different models of such chambers under the '151 Patent.

Claim 11, which describes two galleries connected together, reads as follows:

11. In a drain field for allowing liquid to seep into adjoining ground,

A. a first terminal gallery comprising:

i. a first elongated main body portion having an arch-shaped configuration thereby creating an enlarged enclosure, said elongated main body portion having first and second ends;

ii. first and second end walls respectively covering said first and second ends of said first elongated main body portion, each of said end walls having an opening therethrough for transporting the liquid to and from

-2-

said first gallery; and

iii. a first latching engagement system associated with said first end wall for attaching said terminal gallery to an adjoining gallery in an end-to-end engaged relationship, said latching engagement system including a first rib on said first terminal gallery main body portion adjacent said first end wall, said rib being dimensionally sized to mate engagingly with an associated rib on an adjoining gallery;

B. a second adjoining drain field gallery having only one end wall at its distal end, comprising:

i. a second elongated main body portion having an arch-shaped configuration thereby creating an enlarged enclosure, said second elongated main body portion having two opposed ends;

ii. a third end wall covering one opposed distal end of said second elongated main body portion, said third end wall having an opening therethrough for transporting the liquid to an adjoining gallery; and

iii. a second latching engagement system associated with the other opposed proximal end for attaching said second adjoining gallery to said first terminal gallery in an overlapping end-to-end engaged relationship, said second latching engagement system including a second rib on said second adjoining gallery main body portion adjacent the other opposed proximal end, said second rib being dimensionally sized to vertically seat engagingly on said first rib of said first terminal gallery whereby said first and second galleries are engagingly latched together thereby preventing relative longitudinal movement therebetween, said first and second latching systems further including means to prevent lateral spreading of said first terminal gallery and said second adjoining gallery once said galleries are latched to one another, including said first end wall inhibiting lateral spreading of said first gallery and of said adjoining second gallery and restraining said arch-shaped configuration against deformation; and

C. a drain pipe extending through at least one of said openings in said first, second and third end walls for transporting liquid to the drain field.

-3-

(Pl.'s Ex. 3, Col. 8, l. 40 - Col. 9 l. 28) (emphasis added).

Claim 16, which describes drain field gallery by itself, reads as follows:

16. A drain field gallery for guiding liquid through a drain field and allowing liquid to seep into adjoining ground comprising:

A. an elongated main body portion having a corrugated arch-shaped configuration thereby creating an enlarged enclosure with a plurality of upstanding ribs spaced apart longitudinally therealong;

B. at least one end wall covering one end of said elongated main body portion, said at least one end wall having an opening therethrough dimensionally sized to accept a drainpipe for transporting the liquid to said gallery;

C. a latching engagement system associated with said at least one end wall for attaching said gallery to an adjoining gallery in an end-to-end engaged relationship, said latching system being dimensionally sized to vertically seat in latching engagement on the latching system of the adjoining gallery and to inhibit relative longitudinal movement between the galleries, said at least one end wall inhibiting lateral spreading of said gallery and of said adjoining gallery and restraining said arch-shaped configuration against deformation, wherein said latching engagement system is provided by end ribs of said plurality of ribs, and said end ribs are adjacent the terminal ends of said main body portion and are dimensionally sized to mate engagingly with end ribs on adjoining galleries,

whereby said latching system includes said one end wall as means to prevent spreading of adjoining galleries once latched to one another.

(Id., Col. 12, ll. 3-43) (emphasis added).

The specification, which describes the latching system referred to in Claims 11 and 16, reads as follows:

-4-

To achieve the latching arrangement as shown in FIGS.
(12) and (13), the end wall (28) (shown in dotted line)
of gallery (10) is cut off with a razor along a cut
line (68) and discarded.  As shown in FIGS. (1), (6),
and (14), the cut-line (68) cuts through the stepped
support members (70) and provides notch (72) in each of
the base portions (26) of the gallery (10).
Thereafter, the gallery (10) can be lifted and dropped
to securely latch with the adjoining identical gallery
10A as shown in FIGS. (13) and (14) with rib (18)
seating on rib (18A').  Rib (18A') of gallery (10A) is
identical to rib (18') of gallery (10).  The end wall
(30A) from gallery (10A) provides support for both
galleries.  The stepped support members (70) will be
supported on the associated stepped vertical walls (20)
on gallery (10A) while notches (72) in base portions
(26) interfit with lugs (74A) on the base portion (26A)
of gallery (10A) thereby preventing the spread of
overlapping rib (18).

(Id., Col. 5, l. 54 - Col. 6 l. 2).

## B. The Accused Infiltrator and Stormtech Products

Infiltrator and Stormtech also manufacture and sell arch-
shaped, corrugated rib chambers used in storm and waste water
management.  The model sold by Infiltrator is known as the 3050
chamber, and the models sold by Stormtech are known as the 770
and 440 chambers.[1]  The Infiltrator and the Stormtech chambers
are substantially identical to each other.[2]  Each of the chambers
has an open end and a closed end.  The first chamber in a row may
include an "end plate" attached to the open end.  The contractor

---

[1]  Both Infiltrator and Stormtech also sell "new" models of
these chambers, but they fall outside the scope of the court's
ruling.  See Part III.C., infra.

[2]  The Infiltrator 3050 and the Stormtech 770 are identical
to the Stormtech 440, except that the 440 chamber is 20 inches in
height and the other chambers are 30 inches in height.

installing the chamber can cut a hole in the end plate to allow
for the insertion of an inlet pipe.  On the closed end of each
chamber, there is an end wall which has a semicircular aperture
at the bottom edge allowing for the transport of liquid from one
chamber to another.  The chambers are connected together by
placing a corrugated rib on the open end of one chamber over a
smaller corrugated rib on the closed end of another chamber; if
an end plate is used, the open end of one chamber is fitted over
the end plate.  The chambers do not have lugs, notches, stepped
support members, or vertical support walls.

## II. LEGAL STANDARD

A motion for summary judgment may not be granted unless the
court determines that there is no genuine issue of material fact
to be tried and that the facts as to which there is no such issue
warrant judgment for the moving party as a matter of law.  Fed.
R. Civ. P. 56(c).  See Celotex Corp. v. Catrett, 477 U.S. 317,
322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d
1219, 1223 (2d Cir. 1994).  Rule 56(c) "mandates the entry of
summary judgment . . . against a party who fails to make a
showing sufficient to establish the existence of an element
essential to that party's case, and on which that party will bear
the burden of proof at trial."  See Celotex Corp., 477 U.S. at
322.

When ruling on a motion for summary judgment, the court

-6-

must respect the province of the jury.  The court, therefore, may not try issues of fact.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975).  It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge."  Anderson, 477 U.S. at 255.  Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution."  Gallo, 22 F.3d at 1224.

     Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248 (internal quotation marks omitted).  A material fact is one that would "affect the outcome of the suit under the governing law." Id.  As the Court observed in Anderson: "[T]he materiality determination rests on the substantive law, [and] it is the

-7-

substantive law's identification of which facts are critical and which facts are irrelevant that governs." Id.  Thus, only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted.  When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses.  Immaterial or minor facts will not prevent summary judgment.  See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Del. & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)).  Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion.  Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence.

### III. DISCUSSION

An infringement analysis is "a two-step process in which the court first determines, as a matter of law, the correct claim scope, and then compares the properly-construed claim to the

accused device to determine, as a matter of fact, whether all of the claim limitations are present, either literally or by a substantial equivalent, in the accused device." Johnson Worldwide Assoc's v. Zebco Corp., 175 F.3d 985, 988 (Fed. Cir. 1999) (Citations omitted).  Claim construction requires courts "to examine all the relevant sources of meaning in the patent record," including "the patent's claims, specification, and, if in evidence, its prosecution history." Athletic Alternatives, Inc. v. Prince Mfg., Inc., 73 F.3d 1573, 1578 (Fed. Cir. 1996). "Absent an express definition in the specification of a particular claim term, the words are given their ordinary and accustomed meaning; if a term of art, it is given the ordinary and accustomed meaning as understood by those of ordinary skill in the art." Zelinski v. Brunswick Corp., 185 F.3d 1311, 1315 (Fed. Cir. 1999).

In certain circumstances, "[a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."  35 U.S.C. § 112, ¶ 6.  The use of the word "means" in a claim creates a presumption that the claim element is in "means-plus-function" format. Personalized Media Communications, LLC v. ITC, 161 F.3d 696, 703

-9-

(Fed. Cir. 1999).  This presumption can be rebutted "[w]here a claim recites a function, but then goes on to elaborate sufficient structure, material, or acts within the claim itself to perform entirely the recited function." <u>Sage Prods. v. Devon Indus., Inc.</u>, 126 F.3d 1420, 1427-28  (Fed. Cir.1997). "[C]onstruction of a means plus function limitation requires identification of the function recited in the claim and a determination of what structures have been disclosed in the specification that correspond to the means for performing that function." <u>Epcon Gas Systems, Inc. v. Bauer Compressors, Inc.</u>, 279 F.3d 1022, 1032 (Fed. Cir. 2002).

After properly construing the claims, the court must then examine whether the accused device infringes on them.  In order to prove infringement, "the patentee must show that the accused device contains every limitation in the asserted claims." <u>Mas-Hamilton Group v. LaGard Inc.</u>, 156 F.3d 1206, 1211 (Fed. Cir. 1998). "If, however, even one limitation is missing or not met as claimed, there is no literal infringement." <u>Microstrategy Inc. v. Business Objects, S.A.</u>, 429 F.3d 1344, 1352 (Fed. Cir. 2005). Infringement under the doctrine of equivalents arises "only if an equivalent or a literal correspondence of every limitation of the claim is found in the accused device.  An element is equivalent if the differences between the element and the claim limitation are insubstantial." <u>Zelinski</u>, 185 F.3d at 1316 (internal

citations omitted) (<u>citing</u> <u>Warner-Jenkinson Co. v. Hilton Davis</u> <u>Chem. Co.</u>, 520 U.S. 17, 21 (1997)).

**A. Claim Construction of the '151 Patent**

As the first step in its infringement analysis, the court must construe the terms in the claims at issue. Claim 11 refers to "latching systems further including means to prevent lateral spreading of said first terminal gallery and said second adjoining gallery once said galleries are latched to one another, including said first end wall inhibiting lateral spreading of said first gallery and of said adjoining second gallery and restraining said arch-shaped configuration against deformation." (Pl.'s Ex. 3, Col. 9, ll. 17-25). Claim 16 refers to a latching engagement system associated with at least one end wall, "said at least one end wall inhibiting lateral spreading of said gallery and of said adjoining gallery and restraining said arch-shaped configuration against deformation," and "whereby said latching system includes said one end wall as means to prevent spreading of adjoining galleries once latched to one another." (<u>Id</u>., Col. 12, ll. 32-35, 41-43). The parties disagree over the features that constitute the "means to prevent lateral spreading."

As noted above, the use of the word "means" creates a presumption that 35 U.S.C. § 112, ¶ 6, applies. This presumption, however, can be rebutted if the claims themselves, without reference to the specification, disclose sufficient

structure to perform entirely the recited function.  Based on the prosecution history of the '151 Patent, the court concludes that the "end wall" referred to in Claims 11 and 16 does not provide sufficient structure to perform entirely the function of preventing lateral spreading.

In the original patent application filed by DiTullio in January 1989, what became Claim 16 was drafted as a dependent claim limiting the latching system of the base claim to "means to prevent spreading of adjoining galleries once latched to one another."  (Pl.'s Ex. 20 at 26).  In the First Office Action on June 6, 1989, the PTO Examiner rejected this claim based, <u>inter alia</u>, on an obviousness objection.  On August 14, 1989, DiTullio's patent attorney responded to the First Office Action by attempting to distinguish the prior art.  On October 27, 1989, the PTO Examiner issued a Final Office Action, which indicated that Claim 16 would be allowable if rewritten in independent form, incorporating all of the limitations of the base and intervening claims.  In a further effort to distinguish the prior art, DiTullio's patent attorney added a limitation to the base claim, stating "at least one end wall inhibiting lateral spreading of said gallery and of said adjoining gallery and restraining arch-shaped configuration against deformation."  (<u>Id.</u> at 203).  On March 9, 1990, the PTO Examiner rejected this proposed amendment.  In an Office Action on July 26, 1990, the

Examiner concluded that the language added was "a functional limitation that does not add significant structure to the apparatus claims" and that "the combination of Gorman and Bailey would inherently perform this function. (Id. at 203). The PTO subsequently rejected variations of DiTullio's claim that the end wall's prevention of spreading disclosed patentable subject matter. For example, on February 8, 1991, the PTO Examiner reiterated, "With regard to the claim that the end wall inhibits spreading of the gallery and restrains the arch units against deformation, the combination of Bailey and Gorman would inherently perform this function." (Id. at 219). The Examiner stated, "It would have been obvious to one of ordinary skill in the art to place an end wall on the end of each unit." (Id.). Ultimately, the following "means-plus-function" language was added in proposed Claim 46, which became Claim 16: "whereby said latching system includes said one end wall as means to prevent spreading." (Id. at 237). When this clause appearing at the end of issued Claim 16 was added, the claim was allowed.

Due to the repeated rejection of proposed claims on the ground of obviousness that the end wall was sufficient structure to prevent spreading, the most reasonable interpretation of this last clause of Claim 16 is that the "means to prevent spreading" is not just the end wall. Otherwise, the claim would not define any structure that was not already apparent from the prior art.

Because the end wall alone did not disclose sufficient structure to perform the recited function, the presumption that the elements of Claims 11 and 16 are in "means-plus-function" format has not been rebutted.  Therefore, in accordance with 35 U.S.C. § 112, ¶ 6, the court looks to the specification to determine the structure associated with the means to prevent spreading.  The only structure disclosed as preventing spreading in the specification comprises lugs, notches or apertures, stepped support members, vertical support walls and end walls. Therefore, the "means to prevent lateral spreading" must include these structures.  Nothing in the specification of the '151 Patent suggests that any of these structures are optional.

Defendant Cultec advances two arguments in support of a construction of the claims that would cover devices in which the end wall prevented spreading without the lugs, notches, or apertures, stepped support members, and vertical support walls. First, Cultec asserts that the language in Claim 16 should not be treated as a means-plus-function limitation.  Specifically, Cultec argues that "means-plus-function claiming applies only to purely functional limitations that do not provide the structure that performs the recited function," and that the end wall specified in Claim 16 is not a "purely functional placeholder in which the structure is filled in by the specification."  Phillips v. AWH Corporation, 415 F.3d 1303, 1311 (Fed. Cir. 2005).

-14-

However, Phillips is inapposite because here the evidence shows that the reference to the end wall in Claim 16 does not convey the entirety of the structure needed to perform the function of preventing lateral spreading.  See Altiris v. Symantec Corp., 318, F.3d 1363, 1375 (Fed Cir. 2003) (holding that the presumption of a means plus function claim "can be rebutted where the claim, in addition to the functional language, recites structure sufficient to perform the claimed function in its entirety.").

Cultec contends that, at least, there is a genuine issue of material fact as to whether the end wall can perform the claimed function in its entirety.  Specifically, Cultec attacks the expertise and credibility of Bryan Coppes, the Vice President of Engineering at Infiltrator, who, after performing his own tests, concluded that the end wall did not prevent spreading of the chambers in any meaningful way.  Cultec maintains that there is a significant factual dispute about the efficacy of the end wall in preventing spreading.  The court finds Cultec's argument to be unpersuasive.  To the extent that the end wall could prevent spreading by itself, Claim 16 would not be allowed under 35 U.S.C. § 103 in view of the prior art.  This is evident from the PTO Examiner's numerous rejections of attempts to claim the end wall as a means of preventing spreading without the lugs, notches, or apertures, stepped support members, and vertical

-15-

support walls.

     For the same reason, Cultec's argument that the prosecution history supports its interpretation is unavailing.  Cultec asserts that Ditullio's patent attorney, Robert Ware, made a specific statement about the scope of the clause "means to prevent spreading of adjoining galleries once latched to one another" that narrowed it to mean <u>only</u> the end wall cooperating with the overlapping latched corrugated ribs.  Attorney Ware stated to the PTO Examiner, "original claim 16, specifically defining the overlapping latched corrugated ribs shown in FIGURES 12 and 13 cooperating with the single end wall to stabilize the latched galleries and inhibit lateral spreading, was provisionally approved in the previous action of July 26, 1990 and it's now also here rewritten specifically as independent Claim 46." (Pl.'s Ex. 20 at 238).  However, Attorney Ware's statement in July 1991 can not be relied upon as persuasive evidence of the meaning of Claim 16 as issued since its differs from the wording of the original claim, which did not make reference to an end wall.  Moreover, if Attorney Ware's interpretation were accurate, and the end wall constituted the only means of preventing spending, then the claim would be invalid in view of the prior art.

     Second, Cultec argues that Claim 11 does not require the additional elements provided for in the specification, even while

acknowledging that Claim 11 is a means-plus-function claim. Cultec maintains that the end wall and the overlapping ribs of the latching system are the only <u>required</u> elements to prevent the spreading of adjoining galleries and that the other features mentioned in the specification are merely optional.  This argument ignores well-established principles of claim construction.  As the Federal Circuit has held, "[c]onstruction of a means plus function limitation requires identification of the function recited in the claim and a determination of what structures have been disclosed in the specification that correspond to the means for performing that function." <u>Epcon Gas Systems, Inc. v. Bauer Compressors, Inc</u>. 279 F.3d 1022, 1032 (Fed Cir. 2002).  "In order to qualify as corresponding, the structure must not only perform the claimed function, but the specification must clearly associate the structure with performance of the function." <u>Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.</u>, 296 F.3d 1106, 1113 (Fed. Cir. 2002).  The specification clearly associates the lugs, notches, or apertures, stepped support members, and vertical support walls with the function of preventing spreading.

For these reasons, the court concludes, as a matter of law, that Claims 11 and 16 of the '151 Patent cover only drainage galleries in which spreading is prevented by means that include lugs, notches or apertures, stepped support members, vertical

support walls and end walls, or their equivalents.

### B. Comparison with Infiltrator's and Stormtech's Products

After determining the scope of the disputed claims in the '151 Patent, the court must compare those claims to Infiltrator's and Stormtech's products to determine whether all the claim limitations are present, either literally or by a substantial equivalent, in the accused devices.  The court concludes that the chambers manufactured and sold by Infiltrator and Stormtech do not include means to prevent lateral spreading of the first terminal gallery and the second adjoining gallery once the galleries are latched to one another that comprise lugs, notches or apertures, stepped support members, and vertical support walls, or the equivalent thereof.

Because the allegedly infringed drainage gallery contains claim limitations that are not present in any of the accused Infiltrator and Stormtech products, one could not reasonably conclude that the accused products literally infringe on the '151 Patent.  See Mas-Hamilton, 156 F.3d at 1211 (if even one limitation is missing or not met as claimed, there is no literal infringement).  Moreover, there can be no infringement as a matter of law under the doctrine of equivalents where, as here, a claim limitation is absent altogether from the accused product. See id.; Becton Dickinson Co. v. C.R. Bard, Inc., 922 F.2d 792, 798 (Fed. Cir. 1990).

-18-

Accordingly, the court finds that the accused devices do not infringe Claims 11 or 16 of the '151 Patent.  Since there is no basis for a finding of infringement, Infiltrator and Stormtech were not inducing others to infringe the '151 Patent.[3]  See Joy Techs., Inc. v. Flakt, Inc., 6 F.3d 770, 774 (Fed. Cir. 1993).

## C. The Scope of the Judgment

The defendants argue that the decision rendered by the court should be limited in scope to the "Old Chambers" produced by Infiltrator and Stormtech.[4]  They have maintained throughout their filings the position that the "New Chambers" were never mentioned in either the plaintiffs' original complaint or the amended complaint.[5]  The defendants specifically removed any

---

[3] The movants assert non-infringement of Claim 11 based on other variations in Infiltrator's and Stormtech's products, including the lack of first and second end walls with openings for transporting liquid in the first terminal galleries, and the inability of the "end wall" to inhibit lateral spreading of the first gallery and the second gallery or to restrain the arch-shaped configuration against deformation once the first and second galleries are latched together.  The movants also assert non-infringement of Claim 16 on the ground that the neither the end walls of the accused devices nor the end plates contain an opening or its equivalent.  Cultec argues that these features exist in the accused devices, or in the alternative, that there is a genuine issue of material fact as to whether they exist.  The court does not need to reach these issues, having already found that one limitation is absent from the accused products.

[4] The old version of Infiltrator's chambers is known as the 3050 chamber, while Stormtech's old chambers are known as the 770 and 440 chambers.

[5] Stormtech's new chambers are known as the 740 and 310 chambers, although Infiltrator's new chamber is still referred to as the 3050 chamber.

-19-

references to the "New Chambers" in their amended counterclaim and in their reply memorandum in support of their motion for a preliminary injunction.  The plaintiffs concede that the "New Chambers" were never referenced in their pleadings.  Because the plaintiffs never sought leave to amend their complaint to include the "New Chambers," the judgment of non-infringement with respect to the '151 Patent should be limited to the "Old Chambers," even though it appears that the "Old Chambers" and the "New Chambers" are substantially similar in all material respects.

**IV.   CONCLUSION**

For the reasons set forth above, the Motion for Summary Judgment (Doc. No. 188) filed by Infiltrator Systems, Inc., Stormtech Inc., and James M. Nichols is hereby GRANTED.  Judgment shall enter in favor of the plaintiffs with respect to their causes of action for non-infringement of United States Patent No. 5,087,151 and in favor of the counterclaim defendants and third party defendant James M. Nichols with respect to Count 1 of the defendants' Counterclaim and Third Party Complaint.

The Clerk shall close this case.

It is so ordered.

Dated this 27th day of September, at Hartford, Connecticut.

                                   /s/AWT
                              Alvin W. Thompson
                         United States District Judge